RICHARD M. FOX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28904, 34477. Promulgated March 11, 1929.

*William C. Bristol, Esq.*, for the petitioner.
*Eugene Meacham, Esq.*, for the respondent.

778

780

OPINION.

MILLIKEN: Petitioner's only complaint is that respondent has determined that he was not entitled to deduct, as worthless debts, certain debts which he alleges to have been worthless in the years 1922 and 1923, respectively, which he charged off during said years. The applicable part of the Revenue Act of 1921 is section 214 (a) (7), which reads:

SEC. 214. (a) That in computing net income there shall be allowed as deductions:

\*  \*  \*  \*  \*  \*  \*

(7) Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts) ; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part.

The burden rests on petitioner to establish by the preponderance of the evidence that respondent has erred. Petitioner alleges that his debt against the Pacific Co., to the extent of $7,283.59, became worthless in the year 1922 and that he charged off that amount in that year.

Testifying as to the debts of the Pacific Co. which he sought to deduct in his return for the year 1922, petitioner said:

Q. What the court is interested in is what you did about these items and how. How do you know these are worthless? How did you ascertain them to be and what are the surrounding facts which cause you to take it off as you did as taxpayer?

A. The Pacific Automatic Device Co. along before the time they made up that report was absolutely insolvent. They had no money and the device that had been manufactured for them was unworkable because of the manufacturers making a change in the model without our knowledge, and by refusal to accept

them that way and insisting on him remanufacturing them, he did not have the money to do it, could not manufacture them and he had gone in the hands of the receiver, and the company had no money to pay any men to continue the business, and they owed me a large lot of money, and there was no expectation at that time we could get any salvage.

Here it appears that the most vital fact with respect to the alleged worthlessness of these notes did not happen until after the close of the taxable year. It is absolutely essential under the facts of this case that petitioner should have ascertained these debts to be worthless prior to January 1, 1923. What may have occurred in 1923 in this respect is immaterial to the question involved.

It appears that, prior to the date of the contract with the Olympic Products Co., petitioner had advanced to the Pacific Co. amounts which reach the total of $4,283.59, and that of this amount the sum of $2,263.25 was advanced to that company in the month following its incorporation. We are not informed as to the basis of these credits. This corporation had a capital stock represented by 200 shares, and yet we are not advised as to the par value of each share, much less what was the value of its paid-in or subscribed capital, all of which was liable for the debts of the corporation. The books of the company do not appear to have been lost, and simple balance sheets as of the date of its incorporation and as of December 31, 1922, would have cleared up at least some of the doubts which hang over these transactions. Petitioner was not dealing with the corporation at arm's length. He owned 99 out of 200 shares of its capital stock, was at all times its president and was, as he testified, its " financial backer." All necessary information was readily accessible to him.

The only witnesses introduced at the hearing were petitioner, himself, and the secretary of the Pacific Co. The secretary testified that the total loans by petitioner to the Pacific Co. during the year 1922 amounted to $25,083.22, and that petitioner's loans to the Pacific Co. during 1923 amounted to $5,106.13. On direct examination this witness testified:

Q. Tell the court briefly what you know about these transactions were handled which culminated into notes in 1922 of the amount you read, of $25,000 odd. Just state briefly and openly what happened and what you did.

A. Well, this was money that was advanced to the company to buy merchandise in stock or trade that we had to advance money, or to buy raw material for the factory to manufacture.

Q. Was that relative to swipes of the Olympic Products Company?

A. Yes.

The above testimony is in direct conflict with the purport of certain of the notes filed in this proceeding, which show that petitioner advanced to the Pacific Co. the amount of $4,283.59 before any con-

tract was entered into between that company and the Olympic Products Co. The record in the Circuit Court of Appeals shows that the Pacific Co. in its complaint against the United States Fidelity & Guaranty Co., hereafter called the Surety Co., alleged that the total advances made by the Pacific Co. to the Olympic Products Co. during 1922 amounted to $18,000. It may be that the remainder of the loans was used in some way in connection with that contract, but if so and how, we are not informed.

Petitioner is insistent that all advances made by him were occasioned by the payment of trade acceptances of the Olympic Products Co. upon which he became liable before maturity, and in this connection stated that he advanced no money to the Pacific Co. in 1923 for which he was not obligated in the year 1922. The facts as found show that at least a large part of the money advanced by petitioner to the Pacific Co. was not by reason of prior obligations, but was advanced concurrently with the execution of the notes to him and without prior obligation on his part. Besides, the record in the Circuit Court of Appeals clearly indicates that as late as December 23, 1922, the Pacific Co. advanced to the Olympic Products Co. the sum of $6,500, without previous obligation, and that petitioner's note which represents this amount is dated December 27, 1922, or four days after the money was advanced. Thus we find that petitioner as late as December 27, 1922, was advancing to the Pacific Company for the benefit of the Olympic Products Co., as much as $6,500, or about 36 per cent of the total amount of advancements made to the Olympic Products Co. during the whole of the year 1922. This is not all that is disclosed by the record of the Circuit Court of Appeals. In the proceeding in the District Court, the Pacific Co. alleged in its complaint that it had advanced to the Olympic Products Co. the total amount of $4,000 in January 1923, and that record further discloses that this was advanced without any previous obligation on its part. In fact, $1,500 of this amount was advanced on a sight draft.

The reason why these advancements were made in December, 1922, and January, 1923, despite the fact that the swipes which had been furnished during November and December were not up to contract specifications, is of easy ascertainment. Petitioner was relying on the bond of the surety company. Relative to this, he testified on cross-examination as follows:

Q. Tell me about this bond that has been mentioned here.

A. Before I would enter into a contract with this concern, because they were not strong financially, the Olympic Products Company, they had been in business for years in Seattle, but they needed money to buy the material. We were entering into a contract for 25,000, and in order to get the price they had to buy, to buy the material in large quantities.

Q. Yes.

A. They required more capital than he had, and if we will give either money or credit to a certain extent so we can buy this raw material, we will make you this price. I did not advance the money until I had secured it. I did have a bond from them, what I assumed to be, and it is so taken by a responsible bond house, and they went on investigating the workability of the model, but the possibility of the people to manufacture—they agreed to give me a bond for the performance of that contract to the extent of some $31,000, which was the cost to me of the swipes and in the event I advanced them the full cost of manufacture I would still be protected.

Q. In other words, so that you could not lose this money you were advancing?

A. That was exactly it.

Q. So that the advances you made were not really unsecured?

A. No.

Q. You had a bond of a responsible surety company?

A. Yes.

Q. U. S. F & G?

A. Yes.

Again, he testified on cross-examination:

Q. So that I may be clear in my own mind and counsel may understand for purposes of redirect examination, you had the Pacific Automatic Device Company responsible to you for the money you had advanced first, did you, and later the surety company? Is that so?

A. I do not follow you exactly. You mean not as to time but so far as the security, I had the Pacific Automatic Device Company and second the bond?

Q. Yes.

A. Yes.

Q. You had a dual security?

A. Yes.

Q. Or guarantee for the money you had advanced?

A. Yes.

It is true that the swipes which Olympic Products Co. began to deliver in November, 1922, did not prove salable, but this was the fault of the Olympic Products Co. and a default which was protected by the surety bond. There is nothing in the record that indicates that at any time during the year 1922 the surety company in any way denied its liability. On the contrary, as late as February, 1923, it was offering to grant to the Pacific Co. authority to advance to the Olympic Products Co. the additional amount of $7,000.

Petitioner cites *United States* v. *White Dental Co.*, 274 U. S. 398, and *Hart-Wood Lumber Co.*, 5 B. T. A. 1171. These cases bear no analogy to the questions here involved. In the *White Dental Co.* case the property of the taxpayer had been sequestered by the German Government, with which our country was then at war. The White Dental Co. did not rely on the German Government for payment. In fact, it at that time expected no payment. The property, as pointed out by the Supreme Court, was to all intents lost to the White Dental Co. in the year 1918, and what the taxpayer might then

expect to recover was largely a matter of grace on the part of the German Government. In the *Hart-Wood Lumber Co.* case we said:

In the year 1920, Rae owed the petitioner $9,999, and had no resources. He disappeared in May and sent the petitioner a message that he proposed to commit suicide. The petitioner held an insurance policy on the life of Rae taken out in March of 1920, in which it was designated as the beneficiary. The Commissioner does not dispute that Rae was unable to pay or that, as to him, the debt was worthless, but contends that the life insurance policy was security for such debt in the amount of $5,000, and that, to that extent, the debt was not worthless in the taxable year. The ultimate recovery of any part of the debt by the collection of the insurance policy depends on so many contingencies that it is hardly possible to regard such policy as security of any value. There may be a clause in the policy providing for cancellation in the event of suicide within twelve months of its issue. If death is not proved, seven years must elapse before it can be conclusively presumed. Calif. Code of Civil Procedure, 1923, sec. 1963, subdiv. 26. During such seven years the petitioner must keep the policy alive by the payment of annual premiums. Rae may not be dead or may reappear before the end of the seven-year period. We are of the opinion that the petitioner is entitled to deduct the entire amount of $9,999 from its gross income in its income and profits-tax returns for 1920.

In the instant case, petitioner was relying on the surety bond, the premiums for which had been paid. It is at once obvious that there is a vast difference between relying on a policy of life insurance, the premiums on which are payable annually, and where it was not known whether the debtor was dead or alive, and in relying upon a policy of insurance which was in full force and effect and without which no contract would have been executed with the Olympic Products Co. Since petitioner advanced money to the Pacific Co. on the faith of the bond of surety company, and since that bond was in full force and effect at the end of 1922, we are unable to find on the evidence adduced at this proceeding that respondent erred in denying these deductions.

What we have said with reference to the debts of the Pacific Co. applies to a large extent to the debts of Patterson. Patterson was vice president of the Pacific Co. and owned 96 shares of its capital stock, and of this amount 93 shares were pledged to secure one of his notes to petitioner. As pointed out, we have been furnished no evidence as to the value of these shares. Whatever may have been lost by the Pacific Co. in 1922 by reason of the contract with the Olympic Products Co. was, so far as we are informed, recoverable on the surety bond at least to the extent of $31,250. Patterson did not leave the State of Washington until some time in 1923. The mere fact of his leaving the State is not of itself evidence of the worthlessness of his notes. It is not hinted that his departure was surreptitious, and it is not shown what his earning capacity was or might have been in the future.

The respondent's action with respect to the deduction of these notes is affirmed.

When we come to the end of the year 1923 a different picture is presented. The Pacific Co. had then ceased to do business, except to wind up its affairs. Its swipes had proved unmarketable. The Olympic Products Co., which manufactured the swipes and which existed only by reason of the financial assistance afforded by the Pacific Co., had become a bankrupt. As early as February 15, 1923, the Pacific Co. had refused the offer of the Surety Co. to the effect that the Pacific Co. might, without prejudice to its rights under the surety bond, advance the Olympic Products Co. the sum of $7,000. Except its claim against the Surety Co., the assets that remained to the Pacific Co. were swipes which had only junk value, and accounts receivable, both of which items had a then value of approximately $4,000. Its liabilities were over $35,000, of which there was due petitioner about $30,000. Of this amount petitioner charged off in 1923 only $15,000, leaving due him approximately the same amount, of which, as above shown, he attempted to deduct as of 1922 the total amount of $7,283.59. We are now concerned only with the amount charged off in 1923 and sought to be deducted from the gross income for that year. It is at once evident that, unless something could be recovered from the Surety Co., petitioner's debt was worthless in 1923 in an amount largely in excess of the sum sought to be deducted in that year. Nor do we think it material that petitioner seeks to deduct the whole amount of each note, rather than a part thereof. His total debt was represented by all the notes and under the provisions of section 214 of the Revenue Act of 1921 he had the right to deduct so much of his total debt as he had ascertained to be worthless. This amount he placed at the sum of $15,000, and it is therefore of no importance that this amount precisely represents the principal of certain notes. It may be stated here that endorsements of interest on the notes were made by a clerk without the knowledge of petitioner. He testified that if he had known of this matter he would have had the money received (which in fact arose from the sale of junk swipes) applied as payments on other notes which he had neither charged off nor sought to have deducted either in the year 1922 or the year 1923. We are of opinion on the facts presented by the record that petitioner's debt against the Pacific Co. was worthless and was ascertained to be worthless in 1923 to the extent of $15,000, unless petitioner then believed and had reasonable ground to believe that the Pacific Co. could recover on the surety bond.

The surety bond provided that the Surety Co. should not be " subject to any suit, action or other proceeding thereon that is instituted

later than the 9th day of August A. D. 1923." Such a provision is legal and enforceable unless waived by the insurer. *Cooley's Briefs on Insurance Law*, vol. IV, pp. 3964 and 3989. Not only was no suit brought on the surety bond prior to August 10, 1923, but no suit has ever been brought on the bond. The suit that was filed was based upon an entirely different contract. This fact is disclosed by the excerpt we have made in our findings of fact from the complaint and by the opinion of the Circuit Court of Appeals in *Pacific Automatic Device Co.* v. *United States Fidelity & Guaranty Co.*, 15 Fed. (2d) 164.

After setting forth the allegations of the complaint, to which we have just referred, the court said:

The contract thus pleaded was denied by answer, and at the close of the testimony the court below directed a verdict for the defendant. The judgment on the verdict is now before us for review. *It was conceded on the trial, and is conceded now, that the present action was not on the bond.* Indeed, this is manifest because the bond is in no wise referred to in the complaint. The theory of the case, as advanced by counsel for the plaintiff in error in his brief, is this:

" The theory of the action and foundation of legal liability was that a contract and bond had been executed and given together as one entire transaction constituting a joint and several primary obligation shown by the documents themselves and accompanied with the surrounding facts, circumstances, acts, and transactions of the parties between themselves with subsequent correspondence evidenced and established the liability of defendant in error jointly with its principal to the plaintiff in error to answer for and pay the pecuniary loss sustained by the plaintiff in error; and that this was the whole governing intention of the transaction and the gist of the action."

*But the record utterly fails to show that the defendant in error executed any contract in writing or otherwise, such as is set forth in the complaint, or any contract of any kind, other than the indemnity bond to which we have referred,* and the contention that a surety on such a bond becomes a party to the original contract between the principal and the obligee in the bond and assumes all obligations of that contract, regardless of the conditions, provisions and limitations contained in the bond or indemnity contract, *finds no support in reason or authority.* The contract of the defendant in error was one of indemnity only, and the obligation it assumed must be measured by the terms of the indemnity contract to which it was a party, not by the terms of some other contract to which it was not a party. *Of course, the question of liability on the bond is not before us;* but it would seem entirely plain that the surety incurred no obligation in any event beyond the penalty of the bond, and that a breach of the conditions and provisions of the bond would release it unless waived. This, it would seem, shows the *absurdity* of the contention that the surety was bound absolutely and unconditionally by the terms of the contract between the manufacturer and the purchaser without limitation even as to the amount. Had the bond been for $1, instead of for $31,250, the same contention might be made.

For these reasons, the court below correctly ruled that there was a failure of proof, and its judgment is affirmed. (Italics supplied.)

What impresses us with reference to this suit was its utter futility. The Pacific Co. and petitioner, who sponsored and paid the expense

of this suit, evidently recognized that no suit could be successfully maintained against the Surety Company on its bond and therefore they brought their suit on a contract which had no existence except in their imaginations. We feel at liberty to make this statement in view of the unusually vigorous language used by the Circuit Court of Appeals in discussing the contentions of the plaintiff.

With the right to sue on the bond apparently barred after August 1923, petitioner must have been an "incorrigible optimist" to have had any reasonable expectation of recovering anything against the surety company. Cf. *H. P. Robertson Co.*, 14 B. T. A. 887.

In *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988, the reverse of the instant question was presented. There a corporation of similar name owed the Chicago, Rock Island & Pacific Railway Co. about $5,900,000. This debt was charged off by the railway company in 1915 and a deduction was taken therefor in its income-tax return for that year. At the time of the charge-off, the debtor corporation was insolvent and the debt in so far as it was concerned was worthless. Before the debt was charged off several stockholders of the railway company sued its directors for the whole amount of the loss. After long and fruitless litigation the claim of the stockholders in behalf of the railway company was by agreement settled in the year 1917 for less than one-eleventh of the amount of the principal of the claim. The railway company, in its proceeding before the Board, attempted to transfer the loss of its debt from the year 1915 to the year 1917 on the ground that its debt was not worthless in the former year, when it was charged off and deducted. This contention was denied for the reason that the railway company was well within its rights in taking the deduction in 1915, since its debtor was then insolvent, and its debt was worthless as against its debtor, and for the further reason that the suit against the directors had no real merit. The same rule should apply to this case. We should determine income-tax liability on the basis of reality and not of extravagant hopes. *R. V. Board*, 14 B. T. A. 374. Petitioner in 1923 determined that the debt against the Pacific Co. was worthless to the extent of $15,000 and charged off that amount. There was ample justification for the action he took and his judgment has been verified by subsequent events. His right of deduction should not be denied him for the sole reason that he financed a suit against the surety company brought on a mythical contract. He was, to use the vernacular, throwing good money after bad.

We are of opinion that petitioner should be allowed to deduct from his gross income for 1923 his debt against the Pacific Co. to the extent of $15,000, the amount charged off in that year and claimed in his petition.

*Judgment will be entered under Rule 50.*