DeWitt C. THOMPSON, III, and Diana R. Thompson (83–1393, 83–1396), Thompson & Green Machinery Company, Inc. (83–1394, 83–1395, 83–1397), Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 83–1393 to 83–1397.

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1984.

Decided April 29, 1985.

Mark H. Westlake (argued), Tune, Entrekin and White, Nashville, Tenn., for petitioners-appellants.

Kenneth W. Gideon, Chief Counsel, I.R.S., Glenn L. Archer, Jr., (Lead Counsel), Michael L. Paup, Tax Div., Dept. of Justice, Jonathan S. Cohen, Joan I. Oppenheimer (argued), Washington, D.C., for respondent-appellee.

Before MERRITT, MARTIN and JONES, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

This is an appeal from a decision of the Tax Court, T.C.M. (P–H) ¶ 83,081 (1983), holding that certain bad debt expenses taken by a Tennessee heavy equipment dealer were improperly taken under the reserve for bad debts section, 166(c), of the Internal Revenue Code. We affirm in part and reverse in part.

The taxpayers in this case are Thompson & Green Machinery Company, Inc., a Nashville, Tennessee, dealer in heavy construction equipment; DeWitt C. Thompson, III, its principal shareholder; and Diana R. Thompson, his wife. The case turns entire-

ly on the propriety of certain bad debt reserve deductions made by Thompson & Green in 1971 and 1976. The Thompsons are affected only by Mr. Thompson's interest in Thompson & Green.

## Introduction

Bad debts are deductible from income tax under section 166 of the Internal Revenue Code, which reads in relevant part:

§ 166. **Bad debts**

(a) **General Rule.—**

(1) **Wholly worthless debts.—**There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) **Partially worthless debts.**—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

. . . .

(c) **Reserve for bad debts.—**In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts.

A taxpayer with substantial accounts receivable can reasonably anticipate that some part of these accounts will not actually be received. Because the money is out of his hands and will never come back, Congress deemed it appropriate for the taxpayer to take an immediate deduction.

The taxpayer holds the amount of this deduction in a running reserve account for bad debts. When debts actually become worthless in whole or in part, the reserve account is reduced; if debts written off as worthless are subsequently recovered, the reserve account is increased. At the end of each taxable year, the taxpayer is allowed to increase the reserve account to a level adequate to cover losses properly anticipated on current accounts receivable. If the reserve account has dropped to a negative level in the course of the year, the increase in the reserve will be that much greater than the reserve account at year end. It is this increase in the reserve account that is the actual deduction under section 166(c). *See generally Roth Steel Tube Co. v. Commissioner*, 620 F.2d 1176, 1178–79 (6th Cir. 1980).

It is a radical departure from the general policy of the tax laws to allow a deduction for a loss before its very existence has been ascertained. Any deduction allowed under section 166(c) is a tax preference in the sense that taxpayers not using a bad debt reserve are required to wait until the debt actually has become worthless before taking a deduction under section 166(a). For this reason, the taxpayer bears a heavy burden in showing that the Commissioner abused his statutory discretion. "He must show not only that his own computation is reasonable but also that the Commissioner's computation is unreasonable and arbitrary." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 548, 99 S.Ct. 773, 789, 58 L.Ed.2d 785 (1979) (footnote omitted).

The regulations, set out in relevant part as a footnote,[1] are of limited aid to the

---

1. § **1.166–4 Reserve for bad debts.**

(a) *Allowance of deduction.* A taxpayer who has established the reserve method of treating bad debts and has maintained proper reserve accounts for bad debts or who, in accordance with paragraph (b) of § 1.166–1, adopts the reserve method of treating bad debts may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of deducting specific bad debt items.

(b) *Reasonableness of addition to reserve—* (1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

(2) *Correction of errors in prior estimates.* In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reason-

taxpayer in computing the proper amount of the reserve in specific cases. However, since 1940 courts have frequently looked to the standard used in *Black Motor Co. v. Commissioner*, 41 B.T.A. 300 (1940), *aff'd on other grounds*, 125 F.2d 977 (6th Cir. 1942). The Commissioner there argued that an allowable addition to the reserve is the amount required to bring the year-end reserve as a percentage of total receivables up to the percentage of average annual losses on bad debts for the six years just ended. The Commissioner's computation is set out in 41 B.T.A. at 302. The taxpayer had no proof to support its use of a higher anticipated percentage loss on bad debts. The Board of Tax Appeals approved the use of the formula on the facts in that case.

The test, however, is whether the amount ultimately determined, regardless of formula, constitutes a reasonable addition to petitioner's reserve. What constitutes a reasonable addition will depend upon the facts and circumstances of the business engaged in with relation to general business conditions. A method or formula that produces a reasonable addition to a bad debt reserve in one year, or a series of years, may be entirely out of tune with the circumstances of the year involved. Such, in our opinion, is the situation here, and, in the absence of a showing that the allowance contended for by petitioner is more reasonable than the addition determined by the respondent, the latter amount is approved as a reasonable addition to petitioner's reserve.

*Id.* at 304.

Despite this rather grudging initial use, the *Black Motor* formula subsequently has been treated as the presumptively correct method of calculating the bad debt reserve for an established business. The formula has been challenged in the literature as "demonstrably unsound," primarily because of its exclusively retroactive view. Whitman, Gilbert & Picotte, *The* Black Motor *Bad Debt Formula: Why it Doesn't Work and How to Adjust It*, 35 J. Tax'n 366, 366 (1971). These arguments were made to the Supreme Court in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 547 n. 24, 548–49, 99 S.Ct. 773, 788 n. 24, 789–90, 58 L.Ed.2d 785 (1979). The Court refused to declare the formula invalid, noting that it "possesses the not unconsiderable advantage of enhancing certainty and predictability in an area peculiarly susceptible of taxpayer abuse. In any event, after its 40 years of near-universal acceptance, we are not inclined to disturb the *Black Motor* formula now." *Id.* at 549, 99 S.Ct. at 789. The Court thus ratified rather than altered existing law, which gave the taxpayer a chance to show that the Commissioner abused his discretion in invoking the formula in a given case. *See id.*

### The Gregory Debt

The first issue stems from certain leases of equipment to James T. Gregory, Inc., a highway contractor. Pursuant to state statute, Tenn.Code Ann. § 54–519 (1968) (current version at Tenn.Code Ann. § 54–5–119 (1980)),[2] Gregory was bonded on its

---

able addition necessary in the current taxable year.

Treas.Reg. § 1.166–4(a)–(b).

2. **54–5–119. Contractors must give bonds—Actions—Limitations.**

—All contractors with whom contracts are made by the [Bureau of Highways] shall enter into good and solvent surety bond in an amount fixed by the bureau, conditioned that acceptance or service of process upon the director shall be service on them as their agent duly authorized to that end, and for the full and faithful performance on every part and stipulation of the contract, especially the payment for all materials purchased and for

all labor employed in the contemplated work. This bond must be approved by the bureau and filed with its records.

All actions on bonds furnished under this section shall name the director of highways as a party-defendant and may be instituted in any court of competent jurisdiction in this state, but no such action shall be commenced after the expiration of one (1) year following the date of the first publication of the notice provided for in § 54–5–122 with respect to the involved project.

The current statute differs from that previously in effect only in its section number.

highway projects by United States Fidelity and Guaranty Co. Late in 1970 Gregory suffered severe cash shortages and was unable to meet its obligations under the highway construction contracts. As a result, USF & G took possession and control of Gregory's business in early 1971. USF & G paid all claims made against it as surety on account of Gregory's highway construction contracts, except those of Thompson & Green.

After USF & G took over Gregory, Gregory no longer had employees or assets except those in the possession of USF&G, and Gregory has not since acquired assets or resumed business operations. Gregory's corporate charter was revoked November 19, 1971, for nonpayment of franchise taxes.

In an attempt to recover its loss, Thompson & Green filed suit in early 1971 against USF&G and against Gregory for parts, services, and repairs and for unpaid equipment rentals. Gregory counterclaimed, alleging that the leases were in fact conditional sales contracts and that it had an equity interest in the equipment that Thompson & Green had repossessed. Because Thompson & Green was uncertain of recovery, it employed the law firm of Manier, Crouch, White & Herod on a contingent fee whereby they agreed to take the case for thirty percent of the final recovery, but in no event less than $10,000.

On September 14, 1973, Chancellor Drowota of the Chancery Court at Nashville, Tennessee, determined that USF&G was liable on its bond to Thompson & Green for Gregory's unpaid machine rentals and that Gregory was liable both for unpaid machine rentals and for services, parts, and repairs rendered during the terms of the leases. He also determined that Gregory had no equity in the machinery and dismissed Gregory's counterclaim against Thompson & Green. The Chancellor then referred the case to a Master to determine the amount of Thompson & Green's provable claims for the various items. After the Special Master filed his 155-page report on May 28, 1974, Thompson & Green, Grego-

ry, and USF&G, each through its attorneys, took various exceptions to that report. As a result of these objections, the Chancellor modified the Master's report in certain respects and on April 4, 1975, entered judgment for Thompson & Green against USF&G in the amount of $273,-753.84 for unpaid machine rentals and against James T. Gregory, Inc., in the amount of $403,482.23, plus interest at the legal rate from November 20, 1973, for the unpaid machine rentals and in the amount of $9,884.29, plus interest from April 8, 1971, for unpaid parts and repair services.

Only USF&G appealed the Chancellor's decree. On August 6, 1976, the Court of Appeals for the Western Section of Tennessee (sitting at Nashville) reduced the judgment against USF&G to $202,682.25 and affirmed the Chancellor's decree as so modified. The reason for the reduction was that Thompson & Green had applied $71,-071.59 of payments from Gregory to the parts and service account instead of to the machine account and USF&G contended, and the Court of Appeals agreed, that all payments should be applied to the machine account on which USF&G was liable on its bond. USF&G's suretyship liability did not extend to the parts and service account, and the Court of Appeals held that USF&G was entitled to a credit for the amount of $71,071.59 that Thompson & Green received from Gregory and applied to reduce the balance of the parts and service account rather than the machine account.

Both Thompson & Green and USF&G filed petitions for certiorari to the Supreme Court of Tennessee, but only the surety's petition was granted. USF&G argued on certiorari that the leases were in fact sales contracts and that Thompson & Green's failure to comply with the 30-day notice of claims required by Tenn.Code Ann. § 54–522 (1968) (current version at Tenn.Code Ann. § 54–5–122 (Supp.1984)) released USF&G on five of the seven highway contracts, as previously held in *Thompson & Green Machinery Co. v. Travelers Indemnity Co.*, 57 Tenn.App. 592, 421 S.W.2d 643 (1967). Rejecting these arguments, the

Tennessee Supreme Court on March 29, 1978, upheld the Court of Appeals award to Thompson & Green of some $202,000. *United States Fidelity & Guaranty Co. v. Thompson & Green Machinery Co.,* 568 S.W.2d 821 (Tenn.1978). As a result of this judgment and after payment of its attorneys' fees, Thompson & Green recovered approximately $132,500 (plus statutory interest) in 1978.

At the end of 1971, after the filing of the lawsuit but before any dispositive action by the Tennessee courts, Thompson & Green's accounts receivable included a "machine account" of $405,704.12 due from Gregory and a "parts and service account" of $10,-572.03 due from Gregory. It charged both these receivables to its bad debt reserve account as worthless. This indirectly affected its bad debt reserve deduction for 1971 in two ways: it depleted (in fact, far exceeded) the current reserve, and it increased the allowable year-end reserve for 1971 and the next five years under the *Black Motor* formula. On audit, the examining IRS agent did not challenge the write-off of the "parts and service account," but disallowed the "machine account" write-off.

Thompson & Green's charge-off of the disputed Gregory debt resulted in total charge-offs of $460,905.99 in 1971. Its reserve at the beginning of the year was zero, so its reserve at the end of the year, before the adjusting entry, was a negative $460,905.99. The *Black Motor* formula called for its year-end reserve to be $86,-436.58, so it was necessary to increase the reserve by—that is, deduct—$547,342.57. It also had a bad debt deduction of $14,-245.00 to amortize its 1965 reserve, pursuant to an earlier agreement with the IRS. Its total bad debt deduction was $561,-587.57, which it rounded off to $561,587.

The Commissioner's disallowance of the $405,704.12 charge-off resulted in total allowable charge-offs of $55,201.87 in 1971. Under the *Black Motor* formula, the allowable reserve at the end of the year was the same as that at the beginning of the year, zero. The zero reserves were the result of bad debt recoveries exceeding bad debt charge-offs in 1966, 1967, and 1968. Taxpayers have not argued before us that the Commissioner's use of a zero reserve was unreasonable. The allowable deduction was the total, $69,446.87, of the allowable charge-offs and the 1965 amortization. The Commissioner disallowed $492,140.70, rounded off to $492,141, of the claimed bad debt deduction. The precise computations are set out in the Tax Court's memorandum opinion. T.C.M. (P–H) ¶ 83,081, at 83-246 & n. 5, 83-247 n. 6 (1983). The Tax Court upheld the Commissioner, and we affirm.

■ Taxpayers contend that they were entitled to charge off the disputed Gregory debt to the bad debt reserve in 1971, notwithstanding their action against the surety, USF&G, which ultimately resulted in their collecting approximately half the value of the debt. The test for determining whether it is appropriate to charge all or part of a bad debt to the reserve is the same as the standard for allowing a full or partial deduction for a bad debt under I.R.C. § 166(a). *Roth Steel Tube Co. v. Commissioner,* 620 F.2d 1176, 1180 (6th Cir.1980). Litigation in connection with a debt prevents the taxpayer from charging off the debt only if it is "directly related to the debt as such." *Zeeman v. United States,* 275 F.Supp. 235, 251 (S.D.N.Y. 1967), *remanded on other grounds,* 395 F.2d 861 (2d Cir.1968); Rev.Rul. 80-24, 1980-1 C.B. 47, 48. But an action against a guarantor of the debt to the taxpayer, with a reasonable hope of recovery, will prevent the charge-off. *American Trust Co. v. Commissioner,* 31 F.2d 47, 48 (9th Cir. 1929). Indeed, the very fact that the taxpayer could have filed such an action will deny the charge-off. *Fox v. Commissioner,* 15 B.T.A. 774, 786 (1929).

■ In this case, Thompson & Green did not rely on the existence of a surety when it leased the equipment to Gregory. It was by happenstance that Gregory for the most part used the machinery on highway construction, which was required by state law to be bonded. The surety's obligation was

not based on any direct relationship, unlike the direct guarantees in *American Trust* and *Fox.* Thompson & Green argue that the bond was not "directly related to the debt as such." These arguments, however, result from a fundamental misunderstanding of the rule in *Zeeman.* That rule, accepted by the Commissioner, Rev.Rul. 80–24, is that litigation on the transaction underlying a debt is not an action on the debt, even though the damages claimed can be measured by the debt loss. For example, a taxpayer's action for fraud against a third party who improperly induced the taxpayer to loan money to an insolvent debtor does not prevent write-off of the bad debt. Here Thompson & Green had an action against the surety for the debt, but protests that it had no viable action on the underlying transactions, the equipment leases. Doubtless it will occasionally be difficult to determine whether a taxpayer has an action on a debt, or merely on the underlying transaction, but here it is clear that the action against the surety was an action on the debt.

■ Taxpayers argue that in 1971 the surety's defenses to the suit, notably its defenses that the leases were actually sales contracts and that Thompson & Green was time-barred from filing suit, made recovery so uncertain that it was justified in charging off the debt. The statutory test, however, is worthlessness, not uncertainty of recovery. We cannot say from the record before us that in 1971 the likelihood of recovery was so small that the debt was worthless. An examination of both the defenses USF&G argued before the Tennessee Supreme Court results in little support for the present position of Thompson & Green. More to the point, all three of the Tennessee state courts that considered these cases held for Thompson & Green on both issues.

Thompson & Green argues in the alternative that it was entitled to a write-off for partial worthlessness in 1971, or at any rate before 1978, the year of the final decision of the Tennessee Supreme Court. Thompson & Green's judgment in the Chancery Court against Gregory for unpaid machine rentals was for $403,482.23, but its judgment there against USF&G was for only $273,753.84, as USF&G was responsible only for machine time spent on state highway construction. Thompson & Green did not appeal this judgment, which was entered in 1975. Tennessee law then required appeals to be taken within thirty days of judgment, or at most within sixty days by leave of court. Tenn.Code Ann. § 27–312 (1955) (superseded 1981). On the appeal of USF&G, the Court of Appeals reduced this judgment to $202,682.25, based on its holding that Thompson & Green improperly failed to set off $71,-071.59 of payments from Gregory against USF&G's liability. Although Thompson & Green applied for certiorari, the Tennessee Supreme Court denied the writ, saying it agreed with the court below. *See United States Fidelity & Guaranty Co. v. Thompson & Green Machinery Co.*, 568 S.W.2d 821, 823 (Tenn.1978). The opinion of the Court of Appeals was rendered in 1976; the record does not disclose when the Tennessee Supreme Court denied certiorari.

■ In general, "[u]nder an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Treas.Reg. § 1.461–1(a)(2). There could not, therefore, be any charge-off in 1971, for the amount of the charge-off could not have been determined with reasonable accuracy. That is especially true in this case, where it took the Special Master 155 pages to determine (tentatively) the amount of liability. However, Thompson & Green was entitled to a charge-off in 1975, when it decided in good faith not to appeal the limited judgment against USF & G. It is uncontested that Gregory was then insolvent. Thompson & Green was entitled to a second charge-off when the Tennessee Supreme Court denied the writ of certiorari. In each instance, "the last bell [was] rung in the last court." *United States v. Texas Mexican Railway Co.*, 263

F.2d 31, 34 (5th Cir.1959); *see H. Lieber & Co. v. Commissioner,* 90 F.2d 932, 938 (9th Cir.1937).

## The Scheduled Debts

The second issue stems from Thompson & Green's 1976 attempt to change its method of computing its bad debt reserve. In the years 1974 to 1976, Thompson & Green found that its sales on account were dropping, but its receivables at year end were rising sharply.

| Year | Sales on Account | Trade Notes and Accounts Receivable at Year End | Year-End Trade Notes and Accounts Receivable as Percentage of Sales |
|---|---|---|---|
| 1974 | $29,823,071 | $2,324,011 | 7.79% |
| 1975 | 29,682,138 | 5,941,624 | 20.01% |
| 1976 | 27,354,968 | 8,240,444 | 30.12% |

At year end the assistant credit manager therefore prepared a schedule of accounts receivable that he considered more than ninety days delinquent at the end of 1976. These accounts totaled $1,050,665.99. Thompson & Green determined that sixteen of these accounts were of doubtful collectibility for several reasons. First, some of them were accounts of small coal companies to which Thompson & Green had extended credit, and those companies were then suffering from a weak coal market. Other of the accounts were customers who were new and inexperienced in their businesses. Others had had recent management changes through acquisitions or through the death or illness of principal owners. Finally, one customer had received excessive credit from an overly cooperative sales manager at Thompson & Green who had a long-standing personal relationship with the debtor's principal owners. The specific doubtful accounts were as follows:

| Account | Balance 12-31-76 | Amount collected in cash as of 1-13-81 |
|---|---|---|
| American Recycle | $ 31,946.33 | $20,000.00 |
| Carlon | 8,531.79 | 7,531.49 |

| Account | Balance 12-31-76 | Amount collected in cash as of 1-13-81 |
|---|---|---|
| Delta Cont. Co. | $ 5,173.34 | Not Collected |
| Gregory | 29,861.25 | $29,861.25 |
| Haley Contractors | 220,136.17 | 12,500.00 |
| T.K. Jessup | 30,041.50 | Not Collected |
| Johnson Const. Co. | 8,624.28 | Not Collected |
| Curtis Knott | 5,086.36 | 4,086.36 |
| Savannah Ready Mix | 3,615.39 | 3,615.39 |
| Site Preparation, Inc. | 172,026.86 | Not Collected |
| Site Preparation of Knoxville | 11,163.19 | Repossessed |
| Southland Const. | 329,298.43 | Not Collected |
| Stites Const. Co. | 9,177.22 | 9,177.22 |
| VanBuren Mining | 47,229.58 | Not Collected |
| Woodlawn Mem. Park | 5,196.93 | 5,196.93 |
| James H. Wright | 4,824.31 | 4,824.31 |
| TOTAL: | $921,932.93 | $96,792.95 |

The Tax Court noted that, because of Thompson & Green's bookkeeping practices for repossessions, it is not possible to determine how much of the doubtful accounts were actually collected. We are satisfied from the record that their practices did not substantially understate their collections. There may, of course, have been some recoveries subsequent to the January 13, 1981, Tax Court trial, but it does not appear in the record that any substantial recoveries were still expected from these receivables, all of which were more than four years past due.

Based on these doubtful accounts, Thompson & Green decided to discontinue the use of the *Black Motor* formula and to recalculate its bad debt reserve based on probable exposure to loss. It therefore adjusted its 1976 year-end reserves upward to $880,454, presumably based on 95.5% of the total doubtful accounts. Using the following computation it recalculated its addition to the reserve at $808,899:

| | | |
|---|---|---|
| 1976 year-end reserve | | $880,454 |
| Plus: Losses charged to reserve | 84,116 [3] | |
| Less recoveries | 11,059 | |
| Net Losses | | 73,057 |
| Total reserve requirement | | 953,511 |
| Less 1975 year-end reserve | | 144,612 |
| Deductible addition to reserve | | $808,899 |

3. Thompson & Green did not specify the amount of losses charged to reserve on its tax return, but losses must have totaled $84,116 if its computations are correct. The Commissioner used the figure of $73,057 in the 90-day letter (Form 4089), but this may have been due to a failure to subtract the 1976 bad debt recoveries

of $11,059 from the losses. The parties did not stipulate 1976 losses charged to reserve or balance of accounts receivable at year end. On remand, the parties should stipulate or petition the Tax Court to determine the proper amount of losses charged to reserve in 1976.

The Commissioner disallowed the change and under *Black Motor* recomputed the reserve to only $87,890.28 and a deduction of only $100,629.28, consequently disallowing $708,269.53 of the deduction taken by Thompson & Green. The Commissioner's calculations in the notice of deficiency, which allow no charge-off for the disputed Gregory debt prior to 1978, are set out in the footnote.[4]

■ Thompson & Green argue the Commissioner abused his discretion in applying the *Black Motor* formula in 1976, instead of their specific analysis of accounts receivable. In so contending, of course, they must prove not only that the Commissioner's computation is unreasonable and arbitrary, but that their own computation is reasonable. *Thor Power Tool v. Commissioner,* 439 U.S. 522, 548, 99 S.Ct. 773, 789, 58 L.Ed.2d 785 (1979). We believe the Tax Court was in error in holding Thompson & Green's computation to be unreasonable and not considering the Commissioner's computation.

■ The *Black Motor* formula is presumptively reasonable, *id.* at 549, 99 S.Ct. at 789, but that presumption is not irrebuttable. In its first use of the formula, the Board of Tax Appeals warned that "[a] method or formula that produces a reasonable addition to a bad debt reserve in one year, or a series of years, may be entirely out of tune with the circumstances of the year involved." *Black Motor Co. v. Commissioner,* 41 B.T.A. 300, 304 (1940), *aff'd on other grounds,* 125 F.2d 977 (6th Cir. 1942). The Supreme Court echoed this concern in *Thor Power Tool,* writing, "If a taxpayer's most recent bad-debt experience is unrepresentative for some reason, a formula using that experience as data cannot be expected to produce a 'reasonable' addition for the current year." 439 U.S. at 549,

**4.**

| | | | | |
|---|---|---|---|---|
| Bad Debt Deduction Per Return | | | | 808,898.81 |
| Bad Debt Deduction As Corrected | | | | 100,629.28 |
| Decrease | | | | 708,269.53 |

| Year | Balance of a/r at end of year | Bad debts charged off | Bad debts recovered | Net Bad debts |
|---|---|---|---|---|
| 1971 | $3,616,896 | $55,202 | $2,235 | $52,967 |
| 1972 | 3,129,660 | 43,576 | 6,548 | 37,028 |
| 1973 | 3,311,415 | 39,731 | 3,472 | 36,259 |
| 1974 | 2,165,651 | 26,041 | 2,868 | 23,173 |
| 1975 | 4,796,413 | 67,764 | 10,000 | 57,764 |
| 1976 | 8,251,000 | 73,057 | 11,059 | 61,998 |
| 6 yr. Total | 25,271,035 | 305,371 | 36,182 | 269,189 |
| 6 yr. Average | 4,211,839.17 | | | 44,864.83 |

Per Cent $\dfrac{44,864.83}{4,211,839.17} = .010652075777$ or $1.0652075777\%$

$1.0652075777\% \times \$8,251,000 = \$87,890.28$

| | | |
|---|---|---|
| Reserve | 12-31-75 | $49,259.00 |
| Less bad debts 1976 | | 73,057.00 |
| | | (23,798.00) |
| Add bad debts recovered | | 11,059.00 |
| Balance | | (12,739.90) |
| Addition to reserve | 12-31-76 | 100,629.28 |
| Reserve 12-31-76 | | $ 87,890.28 |

(Note that the Commissioner and Thompson & Green used different figures for 1975 year-end reserve because of their treatment of the Gregory debt and that the Commissioner failed to set off recoveries in the 1971 audit.)

99 S.Ct. at 789 (citing *Westchester Development Co. v. Commissioner*, 63 T.C. 198, 212 (1974), *acq.* 1975–2 C.B. 21). The Commissioner has conceded in the wake of *Westchester* that larger reserves are appropriate if substantiated by the taxpayer. Rev.Rul. 76–362, 1976–2 C.B. 45.

The Tax Court held Thompson & Green's method of calculating its reserve to be unreasonable primarily because the court thought it would lead to double deductions.

Finally, the operation of Thompson & Green's reserve under its new method of computing the reserve balance establishes its unreasonableness. Under this new method, Thompson & Green sought to compute the necessary reserve on the basis of specific doubtful accounts rather than an average of year-end receivables based on historical experience. Thompson & Green's accounting manager, Jerry Brown, testified that "the deduction would have the same net result as if the accounts had been charged off to the reserve." However, it appears that some of these specific debts that Thompson & Green used to compute its addition to its reserve in 1976 were charged off to its reserve in later years, and thus went into computing Thompson & Green's bad debt deduction under section 166(c) for subsequent years. On brief Thompson & Green appears to admit this: " ... [A] number of doubtful accounts used to determine the 1976 reserve had subsequently been written off to the reserve as worthless." Thus, by using these specific debts once in computing the reasonable additions to the reserve (e.g., "as if the accounts had been charged off to the reserve") and by then again charging off such accounts to the reserve as they actually became worthless in the future years, Thompson & Green ended up deducting the *same* bad debt twice. This is plainly impermissible, and points out the fundamental flaw of Thompson & Green's new method.

T.C.M. (P–H) ¶ 83,081, at 83–261 (1983).

The flaw in the Tax Court's reasoning is its concern that the subsequent charge-offs of doubtful accounts will go into computing its bad debt reserve deduction for subsequent years. This, however, is inevitable under any retrospective reserve system. For example, consider the disputed Gregory deduction in this very case. Under the *Black Motor* formula, the write-off was in theory anticipated prior to 1971. Had the write-off in fact been allowed in 1971, it would have swollen the reserve deduction by $492,141, more than $77,000 in excess of its own value. And reserve deductions for the next five years would have been considerably higher by virtue of the larger percentages of receivables to be reserved.

But the Tax Court is correct to the extent that switching between the *Black Motor* and other methods of computation, even if otherwise justified, could unjustifiably increase deductions. When a taxpayer takes a reserve deduction in excess of that determined by *Black Motor*, the Commissioner will take special care that a return to the *Black Motor* formula in the years immediately following will not lead to an unreasonably large deduction. *See* Rev.Rul. 76–362, 1976–2 C.B. 45, 46.

Thompson & Green's method of calculating the reserve in 1976 was not, therefore, intrinsically invalid. The Commissioner argues, however, that "[t]he essential question to be determined in establishing an addition to a bad debt reserve is whether, looking at the factual situation as it exists at the end of the taxable year, the reserve is sufficient to absorb the bad debts that are anticipated during the subsequent taxable year." *Investors Discount Corp. v. Commissioner*, 48 T.C. 767, 771 (1967). Thompson & Green charged only $23,037 (apparently net of recoveries) against the reserve in the subsequent taxable year, obviously far less than the amount of the reserve. By this standard, even the *Black Motor* formula produced an excess reserve.

■ We decline to follow the dictum in *Investors Discount*. There is no indication in the statute that bad debts can be reserved only one year in advance. To the contrary, the whole theory of the provision is that bad debts may be deducted when a

loan is made or a receivable is taken into income, notwithstanding the fact that the character of the individual debts may not become evident for many years. The year-end reserve therefore is calculated as the amount that can be expected to cover losses properly anticipated, whenever occurring, on all the debts outstanding at the end of the tax year. *See Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 546, 99 S.Ct. 773, 788, 58 L.Ed.2d 785 (1979). No other case has followed *Investors Discount*, and its authority for the proposition instead refers to subsequent "years." *Krim-Ko Corp. v. Commissioner*, 16 T.C. 31, 37 (1951).

 In evaluating the reasonableness of a taxpayer's reserve, the rule is that the taxpayer must act on the basis of knowledge available to him at the end of the taxable year; however, a reviewing court, lacking the taxpayer's first hand knowledge, may look to the taxpayer's subsequent loss experience for guidance. *See, e.g., Crown v. Commissioner*, 77 T.C. 582, 600 (1981); *Westchester Development Co. v. Commissioner*, 63 T.C. 198, 212 (1974). Here, Thompson & Green claimed year-end reserves of $880,454, or 95.5% of the schedule of doubtful accounts. Of the total year-end receivables, however, the reserve was only about 10.7%.[5] It is unclear exactly how much of the reserve was charged off in succeeding years.[6] But the evidence clearly proves that $813,977 of the doubtful accounts remained uncollected at the time of trial, January 13, 1981, and there was little if any hope for substantial additional collections. In addition, it is likely that at least some of the accounts not considered particularly doubtful subsequently proved to be uncollectible. We believe that Thompson & Green has proven that its doubts as to these receivables in 1976 were well-founded and borne out by the natural flow of events. We therefore hold its method of calculating its reserve to have been reasonable.

 The second part of taxpayers' burden is to show that the Commissioner's computation was unreasonable and arbitrary. In this case the Commissioner approved a year-end reserve level of $87,890. Actual losses on the scheduled doubtful accounts totaled as much as $813,977, besides whatever losses were incurred on unscheduled accounts. In other words, the actual losses on year-end receivables were nearly 9.3 times as great as the approved year-end reserve. As a rule of thumb, any reserve level would be suspect if actual losses on the receivables were more than 2.5 times as great as the reserve. Here the actual losses were not only far greater than the reserve, but they were predictably greater. The evidence established Thompson & Green carefully examined each doubtful account, and the subsequent failure to collect was in no case fortuitous, but was instead the most probable event based on the information available at the time their return was filed. We believe that taxpayers have shown that the Commissioner acted unreasonably and arbitrarily in disallowing the reserve for 1976.

5. It is unclear from the opinion below and the evidence whether 1976 year-end receivables totaled $8,240,444, $8,251,000 or $8,253,000. Each of these figures results in a percentage of roughly 10.67% to 10.68%.

 Thompson & Green naturally did not include any part of the disputed Gregory debt in its calculations. Oddly, neither did the Commissioner.

6. The evidence includes Thompson & Green's tax returns for 1977, 1978, and 1979. In those years, Thompson & Green did not report its recoveries separately on its tax returns, but netted them out, apparently against charge-offs. The parties have stipulated the recoveries for those years.

| | Reported Charge-offs | Stipulated Recoveries |
|---|---|---|
| 1977 | $ 23,037 | $ 10,804.53 |
| 1978 | 453,110 | 149,992.20 |
| 1979 | 188,595 | 23,139.96 |
| Totals | $664,742 | $183,936.69 |

Of the amount shown for 1978, $132,511.09 represented the collection of the judgment against USF & G on the Gregory debt that Thompson & Green had charged off as worthless in 1971.

 If recoveries were in fact netted against charge-offs, then total charge-offs came to $848,-679. It is in any case clear that charge-offs in those three years were substantial.

The case is affirmed in part, reversed in part, and remanded to the Tax Court for recomputation of the correct taxes due.