EDISON HOMES, INC. FORMERLY ARDMOR, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edison Homes, Inc. v. Commissioner
Docket No. 43399-85
United States Tax Court
T.C. Memo 1988-441; 1988 Tax Ct. Memo LEXIS 480; 56 T.C.M. (CCH) 203; T.C.M. (RIA) 88441; September 15, 1988
James H. Gilbert and Robert M. Spector, for the petitioner. Gail Gibson and Gerald W. Leland, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency of $ 251,665.00 for petitioner's 1981 taxable year, and an addition to tax of $ 12,583.00 plus 50 percent of the interest accruing on the deficiency under section 6653(a). [1] After concessions, the issues remaining for decision are (1) whether petitioner may deduct $ 528,024 as a reasonable addition to its bad debt reserve and (2) whether petitioner is liable for an addition to tax for negligence under section 6653(a). *482 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits to which reference is made therein are incorporated herein by reference. Petitioner, Edison Homes, Inc., is a corporation which had its principal place of business in St. Louis Park, Minnesota, when it filed its petition. During the taxable year at issue, calendar year 1981, petitioner was known as Ardmor, Inc., and was engaged in new and used mobile home sales. Gerald S. Toberman served as petitioner's president, and Mr. Toberman's children held all of petitioner's capital stock. Prior to and during 1981, petitioner entered into a number of agreements with General Electric Credit Corporation ("GECC"). The agreement most pertinent to the instant case was entitled "Mobile Home Time Sales Agreement" (hereinafter the "agreement"). The agreement, dated January 28, 1981, set forth terms for the sale of petitioner of its customer accounts to GECC. The agreement required that all accounts sold to GECC arise "from the bona fide sale or lease and delivery of mobile homes [by petitioner]." The agreement also required petitioner to guarantee payment of the installment *483 obligations of its customers, i.e., the accounts were to be transferred to GECC with recourse. In pertinent part, the agreement stated, If any Buyer shall default in payment for any reason, or otherwise defaults or fails to perform any obligation pursuant to his or her Account for any reason, * * * then and in any such event, Dealer [petitioner] will promply pay to GECC, upon demand, any amounts then remaining on any such Account(s) less any unearned finance charge thereon.
Additionally, Mr. Toberman and Nancy I. Toberman guaranteed petitioner's obligations to GECC under the foregoing and other agreements. In 1981, petitioner conducted business under at least two names, Edison Homes and Toberman Companies. Edison Homes sold mobile homes, while Toberman Companies was involved in the sale of used mobile homes. [2] Petitioner sold accounts generated by both Edison Homes and Toberman Companies to GECC. Periodically, GECC sent petitioner a "Statement of Past Due Accounts," which listed accounts purchased by GECC that were in default. Those statements contained language urging *484 petitioner to make collection efforts, warning that "A past due account is a potential repossession." Petitioner found those notices useful, because it had a relationship with some of the debtors, and could at times procure payment from them. If petitioner's collection efforts failed, GECC would repossess the mobile home that served as collateral for the account. GECC would then send petitioner a document entitled "Account Dur for Repurchase" or, alteratively, "Repurchase/Payoff Request." Those documents demanded payment of a "Repurchase Price" which equaled the "Present Balance" of an account less unearned finance charges. during 1981, GECC sent petitioner notices demanding a total of $ 146,227.95. As of March 24, 1984, petitioner had received demands for payment of past due accounts totalling $ 2,001,282.10. All accounts petitioner sold to GECC were classified under one of four "dealer numbers." According to a summary prepared by GECC, the sum of the "account balances" under dealer number 7036 equaled $ 11,817,229.90, at the end of 1981. The total amount of past due accounts under dealer numbers 7025, 7026, and 0315 were respectively $ 7,688,293, $ 1,030,658, and $ 2,716,751.17. *485 The sum of the "principal balances" of the accounts purchased by GECC from petitioner did not equal the foregoing totals for dealer numbers 7035, 7025, 7026 and 0315 because those amounts included unearned finance charges. For dealer numbers 7036 and 0315 the principal balances, without unearned interest, equaled respectively $ 5,540,883.68 and $ 863,163,42. Principal balances are not available for the two other dealer numbers. The year 1981 was a period of high interest rates, and unemployment and repossessions increased during the year due to poor economic conditions. James Freeman, a former regional manager of GECC, testified that petitioner had a "problem loan portfolio," in 1981. In late 1981, petitioner and GECC stopped making payments to one another because of a dispute over what each owed the other. One source of the dispute was a cash reserve held by GECC and funded by petitioner, which was required to pay an amount into the reserve for each account sold to GECC. GECC charged the reserve with amounts owed by petitioner to GECC pursuant to petitioner's recourse guaranty. GECC ceased providing the notices of past due accounts that had proved helpful in avoiding repossessions. *486 In March of 1982, GECC and petitioner terminated their relationship. Petitioner's accountant computed an addition of $ 528,024 to bad debt reserve for 1981 in the following manner: From a starting reserve balance of $ 264,084, he subtracted $ 17,956 as a charge for specific bad debt losses during 1981, leaving a net balance of $ 246,128. He then determined a reserve requirement of $ 774,152 by multiplying outstanding "account balances" of $ 23,820,059 [3] by 3.25 percent. He then subtracted the reserve balance of $ 246,128 from the reserve requirement of $ 774,152, resulting in a determination that $ 528,024 was necessary as an addition to the reserve for 1981. OPINION Petitioner relies upon section 166(f)(1)[4] in support of its deduction for addition to bad debt reserve. Petitioner contends that certain factors, including poor economic conditions in 1981, justify an addition to its bad debt reserve. Respondent contends that petitioner cannot calculate the addition to its bad debt reserve based upon all accounts it assigned to GECC because some of those accounts *487 did not arise out of sales in the ordinary course of petitioner's business. *488 We hold for respondent. Petitioner bears the burden of proving its entitlement to the deduction for an addition to its bad debt reserve. Rule 142(a). Further, section 166(f)(1) states that a taxpayer's deduction for a reasonable addition to bad debt reserve shall be allowed "in the discretion of the Secretary." Section 166(c)[5] contains identical language, and the Supreme Court in Thor Power Tool Co. v. Commissioner,439 U.S. 522, 548-549 (1979), construed that language as follows: the courts uniformly have held that the Commissioner's determination of a "reasonable" (and hence deductible) addition must be sustained unless the taxpayer proves that the Commissioner abused his discretion. The taxpayer is said to bear a "heavy burden" in this respect. He must show not only that his own computation is reasonable but also that the Commissioner's computation is unreasonable and arbitrary. *489 As explained below, petitioner has failed to prove the need for any addition to reserve for 1981. At the outset, it is helpful to note the nature of a bad debt reserve and distinguish a specific bad debt deduction under section 166(a) from a deduction for a reasonable addition to reserve under either subsections (c) or (f) of section 166. While section 166(a) permits the deduction of individual debts as they become worthless, under the reserve method of reporting bad debts, a deduction is allowed for a "reasonable addition" to reserve. Thor Power Tool Co. v. Commissioner, supra, at 547. In Thor, the court defined a "reasonable addition" as "the amount necessary to bring the reserve balance up to the level that can be expected to cover losses properly anticipated on debts outstanding at the end of the tax year." Accordingly, in deciding whether petitioner made a "reasonable addition" to its reserve, it is necessary first to find the amount of "debts outstanding at the end of the tax year." Once that figure is found, the reserve level which will meet anticipated *490 losses and the appropriate addition may be ascertained. The regulations also defines a "reasonable addition" and likewise emphasize the importance of fixing the amount of debts outstanding at year end. The following language applies to reserves under subsections (c) and (f) of section 166: What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. [Emphasis supplied; sec. 1.166-4(b)(1), Income Tax Regs.] Petitioner asserts that it had an "exposure" of approximately $ 23 million in debts on which it was contingently liable to GECC as guarantor at the end of taxable year 1981. Petitioner *491 contends that if all accounts assigned to GECC at that time were to go into default, it would be required to pay that amount to GECC pursuant to its recourse guaranty. Petitioner therefore asserts that it is entitled to a reserve based upon $ 23 million of guaranteed indebtedness. We reject the amount of $ 23 million advanced by petitioner as the amount of debts outstanding at the end of the taxable year at issue. First, that amount encompasses accounts assigned to GECC which did not arise from sales by petitioner in the ordinary course of business. Section 166(f) is unambiguous. A dealer's reserve for guaranteed accounts must be based solely upon accounts which arise "out of the sale by him of real property or tangible personal property * * * in the ordinary course of his trade or business." Sec. 166(f)(1)(A). Further, section 166(f)(2)[6] expressly prohibits guarantor reserces not meeting the requirements of section 166(f)(1). *492 Although petitioner's president, Mr. Toberman, testified that petitioner sold all mobile homes, new and used, which gave rise to the accounts assigned to GECC, that testimony is at odds with documentary evidence in the record and the testimony of other witnesses, notable Mr. Freeman, GECC's regional manager in 1981. The record contains a file which documents the sale of a mobile home by Terry and Nancy Scruggs to Walter and Madeline Kersten. The file contains a "Statement of Credit Determination" which shows that a division of petitioner, Toberman Companies, submitted a credit application to GECC on behalf of the Kerstens. A "Statement of Sale" and a cancelled check show that Toberman Companies then obtained loan proceeds, payed off an existing encumbrance against the home, retained a "mortgage placement fee," and remitted the balance to a dealer representing the Scruggs, the actual sellers of the home. [7] Although petitioner was listed as "seller" on the conditional sales agreement, the foregoing documents make it certain to us that petitioner was not the actual seller of the used home and that the agreement listed petitioner as seller only in order to facilitate its assignment *493 to GECC. In fact, the file also contains a document, signed by the Kerstens, which plainly states: [Petitioner] is the Agent for placing financing with a lender with respect to the purchase of your mobile home from your dealer." In addition, Mr. Freeman testified to petitioner's "brokerage accounts," stating that he directed petitioner to cease the practice in "late '81." Mr. Toberman himself stated "We also brokered used homes." Mr. Toberman later attempted to "correct" this statement at the urging of his counsel by stating that petitioner bought used mobile homes for resale, but we find Mr. Toberman's first statement more credible. Based upon the foregoing, we find that petitioner acted merely as a mortgage broker (and possibly an escrow agent) for the sale of used mobile homes. We have examined the record and are unable to determine which of the accounts *494 sold to GECC arose from mobile home sales by petitioner. We note that both "brokered" and bona fide accounts were classified under dealer number 7036. Thus, the parties did not classify "brokered" accounts under certain dealer numbers, and we are unable to segregate the accounts in such a manner. We therefore find that an unascertainable portion of the $ 23 million proffered by petitioner as a basis for its dealer reserve represents accounts which did not arise from sales by petitioner in the ordinary course of its business. Such portion cannot serve as the basis for petitioner's dealer's reserve. Sec. 166(f)(1)(A). The second reason that we reject the $ 23 million advanced by petitioner as a basis for its reserve is that the amount does not represent petitioner's true potential liability to GECC as of the end of the taxable year at issue. Rather, the record discloses that unearned interest on assigned accounts is included in the $ 23 million total. The total of $ 23 million is based upon the presupposition that all accounts will be paid over their full term. Although petitioner's accountant quoted petitioner's "outstanding potential liability" as of the end of 1981 at $ *495 23,820,059, the record discloses that petitioner's actual exposure at that time did not include unearned interest and was, therefore, much less than that amount. The "Mobile Home Time Sales Agreement" of January 28, 1981, requires petitioner to pay "any amounts then remaining on such Account(s) less any unearned finance charge thereon." None of the agreements in evidence suggests that petitioner obligated itself to pay GECC prinicipal and unearned interest following a buyer's default. According to Mr. Freeman, petitioner's actual exposure at the end of 1981 was probably one-half of $ 23 million advanced by petitioner as its total liability. Further, the accounting summary produced by GECC to support $ 23 million as petitioner's total liability shows that "principal balances" of the assigned accounts equal approximately one half of the "account balances" upon which petitioner relies. Finally, Mr. Freeman's estimate of petitioner's exposure finds further support in a set of "Account Due for Repurchase" notices sent by GECC to petitioner. Those notices demand payment from petitioner of a "Repurchase Price" which roughly approximates one half of a stated "Present Balance." [8]
*496 Here, petitioner has failed to sustain his "heavy burden." Without providing us with the amount of outstanding liability that can serve as the basis for its reserve, we are unable to find what, if any, addition to reserve would be "reasonable." Petitioner's accountant testified to an opening reserve balance of $ 264,084. He also testified to charges against the reserve of $ 17,956 for 1981. Thus, even assuming no credits to the reserve for recoveries of accounts previously written off, petitioner was left with a reserve of $ 246,128 at year end. As we stated in Handelman v. Commissioner,36 T.C. 560, 565 (1961), "The ultimate question is whether the credit balance in the reserve is adequate to cover such expected losses." In this case, we can neither say that the reserve balance was insufficient nor that respondent's determination that it was sufficient was unreasonable. Thus, we hold that petitioner has not shown it is entitled to deduct the addition to its reserve in the amount of $ 528,024. Rule 142(a); Thor Power Tool Co. v. Commissioner, supra, at 549. *497 [9]
Petitioner bears the burden of proving that an addition to tax under section 6653(a) is not warranted. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rule 142(a). Petitioner argues that it relied upon the advice of its accountant in reporting *498 the deduction for additional to bad debt reserve, citing Kozikowski v. Commissioner,T.C. Memo. 1986-364, and other cases. However, reliance upon expert advice will not exculpate a taxpayer which supplies its return preparer with incomplete or inaccurate information. Lester Lumber Co. v. Commissioner,14 T.C. 255, 263 (1950). In the present case, petitioner supplied its accountant with the total sum of "account balances," which included balances for accounts not arising from sales by petitioner. The accounts which did not arise from sales by petitioner should not have been considered in computing a reserve requirement. Sec. 166(f)(1)(A). Petitioner further points to the lack of "settled law" in the area. Yet, section 166(f)(1)(A) clearly states which guaranteed debts qualify for reserve treatment. In ignoring that language, petitioner failed to exercise "due care." Neeley v. Commissioner,85 T.C. 934, 947 (1985). We therefore hold that petitioner is liable for an addition to tax under section 6653(a). Because of concessions *499 and to reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The parties dispute the nature of this involvement, which is discussed later in this opinion. ↩
3. This figure approximates the sum of the "account balances" for dealer numbers 7036, 7025, 7026, and 0315. ↩
4. Section 166(f)(1) supplies authority for "dealer reserves" and states, in pertinent part, In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) * * * a deduction -- (A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of * * * tangible personal property * * * in the ordinary course of his trade or business * * *. [Emphasis supplied.] Section 1.166-10(b), Income Tax Regs., makes the rules applicable to general bad debt reserves under section 166(c) equally applicable to dealer reserves under section 166(f)(1). Both subsections (c) and (f) of section 166↩ were repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 805(b), 100 Stat. 2361 and bad debt reserves are now available only to certain classes of taxpayers. 5. Section 166(c)↩ states, "In lieu of a deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts."
6. Section 166(f)(2) states, Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations. ↩
7. It is unclear from the record whether Toberman Companies paid off the pre-existing lien after obtaining loan proceeds from GECC or GECC itself directly paid off the lien, as suggested by Mr. Toberman. In either case, Toberman Companies was not the actual seller of the unit and retained only the "mortgage placement fee." ↩
8. Even the sum of "principal balances" due on the accounts would not accurately reflect petitioner's exposure, because after the repurchase of collateral from GECC pursuant to the recourse guaranty, petitioner would resell the collateral for some recovery. ↩
9. In light of our finding that petitioner has failed to prove the amount of outstanding debt to serve as the proper basis for a reserve, it is unnecessary to decide whether the 3.25 percent loss percentage used by petitioner is supported by the record. Further, we need not discuss whether Black Motor Co. v. Commissioner,41 B.T.A. 300 (1940), 125 F2d 977 (6th Cir. 1942), requires that a loss percentage be determined by averaging petitioner's loss experience over a six-year period or whether Thompson v. Commissioner,761 F.2d 259 (6th Cir. 1985), or other authority cited by petitioner justifies a departure from the Black Motor computation, which has been granted a presumption of correctness by the Supreme Court. Thor Power Tool Co. v. Commissioner, supra↩ at 550.