AEROTRON GRANTOR AND STOCKHOLDER TRUST, SIDNEY MENDLOVITZ, TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Aerotron Grantor & Stockholder Trust v. Commissioner
Docket No. 10354-1354-86
United States Tax Court
T.C. Memo 1988-556; 1988 Tax Ct. Memo LEXIS 585; 56 T.C.M. (CCH) 789; T.C.M. (RIA) 88556; December 7, 1988; As amended January 5, 1989 Donald E. Slaughter, for the petitioner. Patrick Lucas, and Frank R. Bailey for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable
Section
Section
Section
Section
Year Ended
Deficiency
661
6651(a)(1)
6653(a)(1)
6653(a)(2)
May 31, 1981
$ 477,484
$   0  $113,621
$ 23,874
$0
May 31, 1983
$  61,915
$6,192
$ 13,854
$  3,096
*
After concessions by the parties, the sole issue for decision is whether petitioner is entitled to a $ 316,362.42 deduction for a bad debt pursuant to section 166 [1] for its fiscal year ending May 31, 1983. *586 FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulations are incorporated in our findings by this reference. Petitioner, Aerotron Grantor and Stockholder Trust, Sidney Mendlovitz, Trustee, is the successor-in-interest to Aerotron Aircraft Radio, Inc., (hereinafter "Aerotron"), a California corporation which liquidated in December, 1984. At all relevant times herein, Aerotron was engaged in the business of refurbishing jet aircraft interiors at its Westwings hanger facility located at the Long Beach Airport, Long Beach, California. Aerotron had its principal place of business in Long Beach, California, when its petition was filed. Aerotron is an accrual method taxpayer with a fiscal year ending May 31. On December 29, 1981, Eastern Air Lines Incorporated (hereinafter "Eastern") and World Jet-Aircraft Industries, Inc. (hereinafter "World Jet") entered into a letter agreement whereby Eastern agreed to sell to World Jet a used Boeing 727 aircraft (hereinafter the "aircraft"). World Jet was a Florida Corporation with principal offices in Fort Lauderdale, Florida, and was engaged in the business of brokering used aircraft. Commencing *587 in February, 1982, World Jet began negotiations with the Republic of Liberia (hereinafter "Liberia") for the resale of the aircraft to Liberia. A condition precedent to the purchase of the aircraft by the Liberians was that the interior of the aircraft had to be modified to a "head-of-state" configuration for use as the country's presidential jet. World Jet subsequently reached an agreement to sell the aircraft to the Liberians, with modifications to the interior, for an undisclosed price. In early June, 1982, World Jet executed a promissory note in favor of Eastern for the purchase price of the aircraft, and also executed a Deed of Conditional Sale and Security Agreement in favor of Eastern. On June 9, 1982, Aerotron entered into a written contract with World Jet which was subsequently twice amended (hereinafter this contract and amendments are referred to as the "June Agreement") whereby Aerotron agreed to perform the interior modifications to the aircraft. Eastern was not a party to the June Agreement. Pursuant to the June Agreement, World Jet agreed to pay Aerotron $ 907,800 for the modification work, payable in three equal installments of $ 302,600. On July 30, 1982, Aerotron *588 and World Jet agreed to modify the payment schedule so that the entire $ 907,800 contract price would be payable by an irrevocable letter of credit to be provided by World Jet to Aerotron. Under the new payment schedule, Aerotron was to draw $ 700,000 from the letter of credit as soon as the funds were available, the balance due on completion. Funds were anticipated to be available in the first week of August, 1982. Subsequent to the execution of the June Agreement and amendment to the payment schedule, Aerotron and World Jet agreed to amend the June Agreement to include various additional modifications to the aircraft at an agreed price of $ 171,800.42, making a total contract price of $ 1,079,600.42 for the aircraft modification work that Aerotron was to perform. On August 18, 1982, the aircraft was delivered by Eastern to Aerotron's Long Beach, California facility. Pursuant to Eastern's agreement with World Jet, possession of the aircraft was transferred to World Jet on delivery of the aircraft to Aerotron's facility. On August 19, 1982, the Deed of Conditional Sale and Security Agreement was filed with the Federal Aviation Administration and, on the same date, Aerotron commenced *589 the modification work on the aircraft's interior. During August and early September of 1982, Aerotron repeatedly made demand on World Jet for the dispersal of the $ 700,000 initial payment due from a letter of credit World Jet was to, but did not, provide Aerotron pursuant to the June Agreement. As a result of World Jet's failure to make the initial $ 700,000 payment, a subcontractor employed by Aerotron temporarily ceased all work on the aircraft as of August 27, 1982. On September 1, 1982, the aircraft was seized by the Los Angeles County Marshall's office to satisfy a judgment debt of $ 56,063.35 previously entered against World Jet in favor of Allred International, LTD, a Colorado corporation (hereinafter "Allred Corporation"). A 24-hour guard was posted on the aircraft to effectuate the seizure. At the time of the seizure, Aerotron was advised by Glen Allred, the president of Allred Corporation, that a search for assets of World Jet by Allred Corporation in connection with its judgment against World Jet had revealed that the only asset of World Jet was a bank account containing approximately $ 4,200. This account was subsequently seized by Allred Corporation as partial *590 satisfaction of its judgment against World Jet. Glen Allred also advised Aerotron to exercise caution in its dealings with World Jet. Further, Glen Allred advised Aerotron that he had been informed in June, 1982, by attorneys for Allred Corporation that Allred Corporation's judgment against World Jet was uncollectible. In pursuing Allred Corporation's judgment against World Jet, attorneys for Allred Corporation had discovered and had informed Aerotron that there were pending lawsuits and unsatisfied judgments against World Jet in the State of Florida. On September 14, 1982, two weeks after the seizure of the aircraft was effectuated, World Jet paid Allred Corporation the amount owed under Allred Corporation's judgment against World Jet and the seizure of the aircraft was lifted. Also on September 14, 1982, World Jet paid to Aerotron the $ 700,000 initial payment due pursuant to the June Agreement. Thereafter, the modification work on the aircraft resumed. The source of funds World Jet used to make the payment to Aerotron was the government of Liberia. The letter of credit, previously promised by World Jet, however, was never provided. On September 28, 1982, Aerotron advised *591 World Jet that the modification work would be completed by November 1, 1982, and that the balance due pursuant to the June Agreement was $ 376,241.83. On November 1, 1982, the aircraft modification had been completed and Paul Finley (hereinafter "Finley"), a vice-president of Aerotron, met in Miami, Florida, with representatives of Eastern, World Jet, and Liberia. At this meeting, World Jet requested that Aerotron permit the aircraft to be flown to Miami for delivery to the Liberians. World Jet wanted the plane to be sent to Miami as a show of faith to the Liberians that the aircraft would be released if the Liberian government provided a letter of credit to cover the outstanding balance due both Eastern and Aerotron. [2] Finley advised those present at this meeting that Aerotron would not release the aircraft to World Jet until payment in full was actually received. After negotiations, Eastern and Aerotron entered into a letter agreement which was subsequently orally amended (hereinafter the letter agreement and oral amendment are collectively referred to as the "November Agreement"). The letter agreement portion of the November Agreement generally provided that Eastern would *592 collect from Liberia and disperse to Eastern and Aerotron a letter of credit covering the amounts owing to both Eastern and Aerotron. The oral amendment modifying the November Agreement provided that Eastern would not release the plane to Liberia before all amounts owing to both Eastern and Aerotron were received from Liberia. The letter agreement portion of the November Agreement provided as follows: November 1, 1982 Aerotron Aircraft Radio, Inc.
3521 East Spring Street
Long Beach, California 90806 Gentlemen: This is to confirm our agreement that Eastern will accept funds from the Republic of Liberia for the account of World Jet-Aircraft Industries Ltd. in payment for one Boeing 727-100 aircraft, Serial No. 18253. Upon receipt Eastern will make payment to Aerotron for the benefit of World Jet-Aircraft Industries based upon receipt of a final invoice from Aerotron. This payment to Aerotron shall be subject to (a) receipt by Eastern of the above-described payment from the Republic of Liberia, (b) there being sufficient funds transferred to Eastern to pay all amounts due Eastern from World Jet-Aircraft Industries and payment of the above-described invoice from Aerotron, *593 (c) the amount due Aerotron not to exceed $ 380,000 and (d) the agreement of Aerotron to release the aircraft for flight from Aerotron's facilities in California to Eastern's facilities in Miami, Florida prior to this transfer of funds. If the above accurately described your understanding of our agreement, please so indicate by executing and returning to me one copy of this letter. Sincerely, EASTERN AIR LINES, INC.
By: /s/ G. Dutton Vice President AGREED AND ACCEPTED BY: AEROTRON AIRCRAFT RADIO, INC. By: /s/ Paul Finley Vice President On November 10, 1982, the aircraft was flown to Eastern's facility in Miami, Florida. Late in the afternoon on Friday, November 26, 1982, World Jet assigned to Eastern a letter of credit, in the amount of $ 1,300,000, drawn on the National Bank of Liberia in favor of World Jet. This amount was sufficient to pay Eastern in full, but only provided partial payment to Aerotron. Upon delivery of the letter of credit, World Jet demanded that Eastern release the aircraft. After confirming that the letter of credit was valid, Eastern *594 released the aircraft to World Jet and the aircraft departed Miami, Florida for Monrovia, Liberia at 3:00 a.m. on November 27, 1982. Before releasing the aircraft, Eastern did not notify Aerotron of the receipt of the letter of credit or that the letter of credit was insufficient to pay both Eastern and Aerotron in full. On December 3, 1982, Eastern invoiced World Jet $ 1,236,762 for Eastern's sale of the aircraft to World Jet and collected that sum from the Liberian letter of credit. On December 7, 1982, Aerotron learned that the aircraft had been released by Eastern and flown to Liberia, and that the letter of credit was insufficient to pay in full both Eastern and Aerotron. On that same date, Aerotron sent a telex to Eastern which provided as follows: EASTERN A/L ATTN: A/C SALES DEPT--GEORGE DUTTON, V.P. OR AUTHORIZED ASST. PLS ADV BY RETRN WHEN WE MAY RECV FULL PAYMNT OF OUTSTANDING 376,600.42 USD BAL DUE ON BOEING 727 FOR WORLD JET INDUSTRIES/REP OF LIBERIA. PLS BE REMINDED WE RELEASED A/C TO EASTERN ON COND WE BE PAID IN FULL BY EASTERN WHEN A/C WAS DEREGISTERED AND WERE NOT CONSULTED PRIOR TO RELEASE AND DEL OF A/C. WE URGNT NEED OF FULL AMT SINCE WE HAVE ALREADY *595 EFFECTED PAYMENTS TO ALL SUBCONTRACTORS FOR LONG RANGE TANKS ETC. URGNT U REPLY BY RETRN. BST PERSNL RGDS
R.C. CANNADY
PRESIDENT
AEROTRON LGB On December 10, 1982, Eastern sent a telex to Aerotron in response to Aerotron's telex to Eastern stating as follows: R.C. CANNADY
PRESIDENT
AEROTRON LIBERIA TRANSFERRED $ 1,300,000 TO EASTERN UPON DELIVERY OF THE B727-25 AIRCRAFT TO MONROVIA. AFTER DEDUCTING THE 1,236,762 BALANCE DUE EASTERN THERE REMAINED 63,238 FOR DISTRIBUTION. WE HAVE BEEN INFORMED BY WORLD-JET THAT THE AMOUNT DUE FROM WORLD-JET TO AEROTRON IS IN DISPUTE. WE ARE HOLDING THE 63,238 IN A SEGREGATED, INTEREST BEARING ACCOUNT AND WILL DISTRIBUTE UPON RECEIPT OF AN AGREEMENT ON DISBURSEMENT EXECUTED BY WORLD-JET AND AEROTRON. IF NO AGREEMENT, THEN WE SHALL FILE AN INTERPLEADER AND DISPERSE UPON DIRECTION OF THE COURT. REGARDS, W.A. BRIEDENBACK
VICE PRESIDENT
FUEL AND EQUIPMENT CONTRACTS On December 15, 1982, Eastern sent another telex to Aerotron stating as follows: AEROTRON ATTN.: R. C. CANNADY, PRESIDENT
LONG BEACH, CA
TELEX 65-6377
ZCZC 04301 MIAMI, FLORIDA
REFERENCE: YOUR TELEX MASH/WORLD JET DATED DECEMBER 14 AS YOU KNOW, PER YOUR NOVEMBER 1, 1982 LETTER, *596 EASTERN'S OBLIGATION TO DISBURSE FUNDS TO AEROTRON WAS SUBJECT TO QUOTE THERE BEING SUFFICIENT FUNDS TRANSFERRED TO EASTERN TO PAY ALL AMOUNTS DUE EASTERN FROM WORLD JET-AIRCRAFT INDUSTRIES AND PAYMENT OF THE . . . INVOICE FROM AEROTRON END QUOTE. AS I DESCRIBED TO YOU IN MY TELEX, THERE WAS NO ASSURANCE OF THE DOLLAR AMOUNT OF THE LETTER OF CREDIT LIBERIA WOULD ISSUE AND EVENTUALLY EASTERN RECEIVED ONLY 1.3 MILLION. OUR SOLE OBLIGATION, IF ANY, IS TO DISBURSE TO AEROTRON THE 63,238 BALANCE. EASTERN HAS NO OBLIGATION CONTRACTUAL OR OTHERWISE TO ASSURE AEROTRON FULL PAYMENT. THE QUESTION OF OBLIGATION TO PAY IS STRICTLY BETWEEN AEROTRON AND WORLD JET. WE WERE INFORMED, VERBALLY, BY WORLD JET THAT THE INVOICE BETWEEN AEROTRON AND WORLD JET WAS IN DISPUTE AND WE UNILATERALLY HELD THE FUNDS. WE WOULD PREFER THAT ALL PARTIES BE IN AGREEMENT WHEN WE DISBURSE TO AEROTRON. IF YOU WILL CALL ME WE CAN DISCUSS AEROTRON'S POSITION AND ATTEMPT TO RESOLVE THIS BETWEEN ALL PARTIES. REGARDS, PAUL G. MERCER, DIRECTOR-PURCHASE CONTRACTS, EASTERN AIR LINES, INC. [Emphasis supplied.] On December 22, 1982, despite the existence of a possible dispute as to whether World Jet owed Aerotron *597 the balance claimed by Aerotron to be owing, Eastern decided to transfer to Aerotron the $ 63,238 remaining from the Liberian letter of credit, leaving a balance due to Aerotron from World Jet of $ 316,362.42. On January 7, 1983, Aerotron filed suit in the United States District Court against World Jet and Eastern (hereinafter "the lawsuit"). Aerotron's complaint in the lawsuit alleges that World Jet had breached the June Agreement with Aerotron in that World Jet promised to pay Aerotron $ 1,079,600.12 but only made payments of $ 763,238. Aerotron's complaint also alleges that Eastern had breached the November Agreement with Aerotron in that Eastern promised, by its oral modification, that it "would not release the Aircraft to Liberia unless and until full payment from Liberia was assured and that Eastern would advise [Aerotron] of the terms of the Liberian letter of credit before release by Eastern of the Aircraft." The pleadings in the lawsuit further state that "Eastern breached the contract by releasing the Aircraft to Liberia without first advising [Aerotron] of the terms of the Liberian letter of credit and without first assuring that full payment by Liberia was provided. *598 " In addition to alleging World Jet's breach of the June Agreement and Eastern's breach of the November Agreement, Aerotron's complaint in the lawsuit also contained several tort claims against World Jet and Eastern. Aerotron's tort claims against World Jet were based upon fraud and negligent misrepresentation. Aerotron's tort claims against Eastern were based upon fraud and deceit. Aerotron also asserted a single tort claim for conspiracy against both Eastern and World Jet based on an alleged conspiracy by both defendants to make fraudulent misrepresentations to Aerotron before releasing the aircraft to the Liberians. The lawsuit did not contain a claim against Eastern based upon any breach of a guarantee. The measurement of compensatory damages for all of Aerotron's contract and tort claims was based upon the amount by which World Jet owed Aerotron pursuant to the June Agreement. This was the same amount that Aerotron had deducted as a bad debt deduction for its fiscal year ending May 31, 1983. Aerotron was advised by counsel prior to May 31, 1983, that its best chance for recovery in the lawsuit was against Eastern on the claims for fraud and conspiracy, i.e., the tort *599 claims. World Jet was named in the lawsuit by Aerotron in order that Aerotron might also get a judgment against Eastern on the conspiracy claim. On March 23, 1983, an attorney for Aerotron gave instructions via a letter to another branch office of the law firm representing Aerotron in the lawsuit "to start discovery just as soon as possible with a view toward obtaining a prejudgment writ of attachment against World Jet whom, the client believes, may be transferring assets." However, this action was taken merely as a precaution as attorneys for Aerotron did not believe that Aerotron had a reasonable prospect of recovery from World Jet at the time Aerotron filed its lawsuit against both Eastern and World Jet since they believed that World Jet had no assets and thus was insolvent. Subsequent to November 26, 1982, the date the aircraft was flown to Liberia in the dead of night, and prior to May 31, 1983, the date ending Aerotron's fiscal year at issue, Aerotron took various steps relating to the collection of the outstanding balance of $ 316,362.12 World Jet owed Aerotron pursuant to the June Agreement. Aerotron conducted periodic checks of the Federal Aviation Administration records *600 in Oklahoma City and determined that World Jet did not have title to any other airplanes. An agent of Aerotron visited the headquarters of World Jet in Fort Lauderdale, Florida, and learned that World Jet's office in Florida had been abandoned. Prior to such agent's visit, Aerotron had made many telephone calls to World Jet's offices but was never able to get beyond a secretary or receptionist to talk to a principal of World Jet. Next, Aerotron tried to call the principals of World Jet at their homes but again was unsuccessful in speaking with any of them. In addition, Aerotron sent written correspondence to World Jet which went unanswered. Further, Aerotron contacted acquaintances in the aircraft industry as a means to attempt to make contact with the principals of World Jet. In sum, prior to its fiscal year ending May 31, 1983, Aerotron reasonably concluded that World Jet was insolvent because World Jet did not have any assets which could be identified and because, after diligent efforts, Aerotron was unable to contact any of the principals of World Jet to disaffirm this belief. On October 8, 1984, the attorneys of record for World Jet in the lawsuit filed a Motion for Leave *601 to Withdraw stating that "the corporation was defunct and unable to pay its bills." One of the bills World Jet failed to pay was its attorney fees. World Jet was subsequently involuntarily dissolved by the State of Florida on November 21, 1984. Although it filed a counterclaim against Aerotron in the lawsuit, World Jet did not offer a defense at the trial of the lawsuit. In June, 1985, a directed verdict for $ 316,362.442 was granted to Aerotron, and a judgment was entered against World Jet on July 22, 1985. At the conclusion of the lawsuit, Aerotron's case against Eastern was submitted to the jury on all theories of liability, and the jury was instructed to render a general verdict. Pursuant to the Court's instructions, a finding in favor of Aerotron on any theory of liability automatically resulted in an award of $ 316,362.42 for compensatory damages. The jury's only discretion, if it held for Aerotron, was to determine whether to also grant an award of punitive damages. The jury found in favor of Aerotron against Eastern and on July 22, 1985, a judgment was entered against Eastern in favor of Aerotron for $ 316,362.12 for compensatory damages and punitive damages of $ 150,000. *602 It is unclear whether the jury awarded the damages based on Aerotron's contract or tort claims. The inference is that the jury award was based on the tort claim, since California law does not permit recovery of punitive damages in contract claims. As of the date of trial by this Court, Eastern had an appeal pending with respect to this judgment and had not paid Aerotron any part of the judgment. For its tax year ending May 31, 1983, Aerotron reported accrued income of $ 1,079,600.42 as a result of modifications to the aircraft. Furthermore, Aerotron deducted $ 316,392 as a bad debt as a result of World Jet's failure to pay for all of such modifications. Respondent's statutory notice sent to petitioner makes various adjustments to petitioner's taxable income for both its 1981 and 1983 fiscal years, and asserts various additions to tax for both years. After concessions by both parties, the only disputed item outstanding is the deficiency for Aerotron's fiscal year ending May 31, 1983, arising from respondent's disallowance of petitioner's claimed bad debt deduction. All additions to tax have been conceded by respondent. OPINION The sole issue is whether Aerotron is entitled *603 to a bad debt deduction of $ 316,362.42, pursuant to section 166, for its fiscal year ending May 31, 1983. Section 166 allows as a deduction the amount of any debt which becomes worthless within the taxable year. The parties have stipulated that a debt within the meaning of that section is here involved. The focus of our inquiry is whether the World Jet debt became worthless in the year claimed. Aerotron has the burden of proof on this issue. Cimarron Trust Estate v. Commissioner,59 T.C. 195, 199 (1972); Millsap v. Commissioner,46 T.C. 751, 762 (1966), affd. 387 F.2d 420 (8th Cir. 1968); Rule 142(a). The determination of whether a debt became worthless within a given taxable year is not based on a standard test or formula, but rather depends on the facts and circumstances of the case. Crown v. Commissioner,77 T.C. 582 (1981); Estate of Pachella v. Commissioner,37 T.C. 347, 353 (1961), affd. per curiam 310 F.2d 815 (3d Cir. 1962); Dallmeyer v. Commissioner,14 T.C. 1282, 1291-1292 (1950). The year of worthlessness must be fixed by indentifiable events which form *604 the basis for a belief that reasonable grounds exist that there is no longer any hope of recovery. Crown v. Commissioner, supra;Estate of Mann v. Commissioner,731 F.2d 267 (5th Cir. 1984). Conversely, a bad debt is not deductible if there exists a reasonable prospect of recovery. United States v. S. S. White Dental Mfg. Co.,274 U.S. 398 (1927); Estate of Pachella v. Commissioner, supra;Parmelee Transportation Co. v. United States,351 F.2d 619 (Ct. Cl. 1965). All pertinent evidence, including the value of the collateral, if any, securing the debt, and the financial condition of the debtor, is to be considered. Sec. 1.166-2(a), Income Tax Regs.; Riss v. Commissioner,478 F.2d 1160, 1166 (8th Cir. 1973), affg. 56 T.C. 388 (1971). A debt which is secured, be it in the form of a guarantee, collateral or a security bond, is not worthless if the debtor is solvent or the security is not worthless or, in the case of the guarantee, the guarantor is solvent. Thompson v. Commissioner,761 F.2d 259 (6th Cir. 1985) affg. in part, revg. in part on a different issue *605 T.C. Memo. 1983-81; Stranahan v. Commissioner,42 F.2d 729, 730-731 (6th Cir. 1930), affg. 14 B.T.A. 1405 (1929); American Trust Co. v. Commissioner,31 F.2d 47, 49 (9th Cir. 1929), affg. 10 B.T.A. 490 (1928). A creditor must exhaust all reasonable means of collecting the debt, A. Finkenberg's Sons, Inc. v. Commissioner,17 T.C. 973 (1951), but the creditor does not have to be "an incorrigible optimist" that the debt will be paid. United States v. S.S. White Dental Mfg. Co., supra.Further, the mere existence of a claim for recovery or pending litigation alone will not preclude a taxpayer from recognizing a loss where the chances of recovery are miniscule. Parmelee Transportation Co. v. United States, supra.The taxpayer, however, must establish using sound, objective business judgment that there was no realistic possibility that the debt would ever be paid. Raffold Process Corp. v. Commissioner,153 F.2d 168, 171 (1st Cir. 1946). Respondent contends that Aerotron's World Jet debt was not worthless within the year at issue. Respondent *606 asserts, first, that in view of the objective facts known to Aerotron at the end of the taxable year at issue, it was not reasonable to conclude that World Jet was unable to pay Aerotron the outstanding balance due under the June Agreement. Respondent points out that World Jet had paid Aerotron $ 700,000 and had satisfied its judgment debt to Allred Corporation prior to May 31, 1983, the last day of the taxable year at issue. Further, respondent asserts that petitioner should have, but did not, depose representatives of World Jet to determine that corporation's net worth and Aerotron's prospects of recovery against World Jet before concluding that the World Jet debt was worthless. Despite these contentions by respondent, we find that Aerotron justifiably concluded that it did not have a reasonable prospect of recovering any part of the outstanding balance due from World Jet under the June Agreement. As to the payment of $ 700,000 by World Jet, we find that this payment was made indirectly by Liberia through World Jet and that Aerotron was aware of this fact prior to the end of the taxable year at issue. Also, Aerotron took reasonable steps to determine that its World Jet debt *607 could not be collected from World Jet. Aerotron periodically checked the records of the Federal Aviation Administration and determined that World Jet, as a broker of used aircrafts, did not have title to any other aircrafts. Aerotron consulted with the president of Allred Corporation who informed Aerotron that Allred Corporation had conducted an asset search of World Jet, discovering that World Jet had only a bank account of $ 4,200 which Allred Corporation subsequently seized. Further, Aerotron was unable to correspond with the principals of World Jet and determined that World Jet's offices in Florida had been abandoned. Under the facts of this case, Aerotron does not have to inquire further, such as by deposing a representative of World Jet, before it may conclude that its World Jet debt was worthless, at least as to World Jet, for purposes of determining its entitlement to a bad debt deduction. Such action here would have been an exercise in futility. Second, respondent contends that Aerotron's World Jet debt was not worthless as to World Jet within the year at issue because Aerotron was maintaining a suit against World Jet the same year that Aerotron was claiming a deduction *608 for a bad debt. We find that Aerotron's inclusion of World Jet as a party to the lawsuit is not significant under the facts of this case. Aerotron was aware that the probability of successfully obtaining a judgment against World Jet for the nonpayment of its debt to Aerotron was practically certain, but Aerotron did not have any reasonable prospect of recovering on such a judgment. See Parmelee Transportation Co. v. United States, supra. Making World Jet a party to the lawsuit permitted Aerotron to raise its conspiracy tort claim against Eastern. Although Aerotron believed that a judgment against World Jet was valueless, it knew that a judgment against Eastern, a solvent third party, was not. In sum, we conclude that Aerotron exercised sound business judgment in concluding that World Jet was insolvent within the year at issue and that its World Jet debt was worthless, as far as it collectibility from World Jet was concerned, despite the existence of its lawsuit against World Jet. Respondent next argues that the relationship of Eastern to Aerotron, by virtue of the November Agreement between Eastern and Aerotron, is essentially that of a guarantor of the payments *609 that World Jet was obliged to make under the June Agreement. Respondent argues that if Eastern can be characterized as a guarantor, then as long as Aerotron was pursuing its World Jet debt against a solvent third party guarantor, Eastern, its World Jet debt was not worthless. See American Trust Co. v. Commissioner, supra;Thompson v. Commissioner, supra.
Although respondent concludes in his briefs that Eastern was a guarantor of the World Jet debt, he has indecisively referred to Eastern's alleged obligation to pay the World Jet debt as a "guarantee," a "defacto guarantee," an "assurance," a "collateral assurance," an "assurance agreement," a "collateral assurance agreement," a "collateral security," and a "collateral security agreement." Respondent's confusion is understandable in that the result of the lawsuit deciding the nature of Eastern's alleged obligation is similar to a guarantee in that Eastern must pay to Aerotron World Jet's outstanding debt to Aerotron. Aerotron, however, refers to Eastern's obligation pursuant to the November agreement as merely that of an escrow holder. In its lawsuit against Eastern, Aerotron asserted that Eastern *610 promised that it would not release the aircraft until and unless Liberia paid the outstanding balance due both Aerotron and Eastern, but never asserted that this promise represented a guarantee. The fact that a breach of this promise may result in a judgment against Eastern for compensatory damages equal in amount to the amount of the debt, does not mean that Aerotron's action was one for breach of a guarantee. Although we are unconvinced that Eastern's obligation to Aerotron was that of a guarantor, we do not find that a resolution of this issue is dispositive of this case. Respondent argues that even if we find that Aerotron's lawsuit against Eastern was not directly related to the debt in the nature of an action relating to a guarantee, but rather, is a collateral action, then its deduction of its World Jet debt is still not proper for the taxable year at issue because Aerotron still had a reasonable prospect of a recovery of the amount of the debt from Eastern. In Exxon Corp. v. United States,7 Cl.Ct. 347 (1985), revd. on other grounds 785 F.2d 277 (Fed. Cir. 1986), involving the effect of a collateral action on the worthless of a bad debt, the *611 court held that section 166 does not draw a distinction between a recovery on the debt and a recovery in a collateral action for the amount of the debt. "[W]hat mattered was not the legal theory employed but whether the taxpayer had a reasonable prospect of making his loss whole." Exxon Corp. v. United States, supra at 357. In Exxon Corp., the taxpayer's debt became worthless but the court found as a fact that it could have pursued a collateral action against the same debtor under a theory of fraudulent conveyance. The Exxon Corp. court found that the availability of legal recourse that has a reasonable prospect of success in recovering the amount of the bad debt precludes a determination of worthlessness. We find this to be a reasonable interpretation of section 166. As the court in Exxon Corp. stated, "It would serve no policy of the tax code to reject a simple, common sense construction of section 166 in favor of the arcane line-drawing suggested by plaintiff", 7 Cl.Ct. at 356. Accordingly, we hold that the determinative fact is not whether a pending action, which is related to the debt, is a collateral action against either the *612 debtor or a third party. What is determinative is whether, as a result of the action, the taxpayer has a reasonable prospect of making his bad debt loss whole against any party. Applying this standard to the case at bar, Aerotron has conceded that when it instituted its lawsuit against Eastern it had a prospect of recovery from Eastern since Eastern was a solvent defendant. We must determine whether at the time the lawsuit was instituted, Aerotron's prospects for making their loss whole against Eastern were reasonable. Although a remote possibility of recovery in a lawsuit will not establish that a debt is not worthless, the court in Parmelee Transportation Co. v. United States, supra at 154, noted that for purposes of section 166 a chance of recovery in the 40-50% range would be sufficient to establish that a loss is not currently deductible. After considering all the facts in this case, we find that Aerotron had a reasonable prospect of recovering the amount of their bad debt loss from Eastern as of the end of the fiscal year at issue. Accordingly, we hold that Aerotron is not entitled to claim its bad debt loss of $ 316,362.42 for its fiscal year ending May 31, 1983. *613 To reflect the foregoing and concessions, Decision will be entered pursuant to Rule 155.
Footnotes
*. 50 percent of the interest due on $ 61,915.↩
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The record does not reflect whether World Jet was ever paid by the Liberians for the aircraft.↩